## Wilson *v.* Edwards, Appellant.

*Sale—Fraudulent sale—Sale in bulk of stock of merchandise—Notice— Parties—Act of March 28, 1905, P. L. 62.*

Under the Act of March 28, 1905, P. L. 62, entitled "An Act relative to the sale in bulk of the whole, or a large part of a stock of merchandise and fixtures, not in the ordinary course of business; providing certain requirements therefor; imposing certain duties upon the seller, and making their violation a misdemeanor," a creditor who has not received

the notice of the sale provided by the act may proceed alone without the co-operation of other creditors to have the sale declared fraudulent and void, and this he may do by securing a judgment against the debtor, and issuing execution against the goods in the hands of the purchaser.

The language of the Act of March 28, 1905, P. L. 62, that such sale without notice "shall be deemed fraudulent and voidable as against the creditors of the seller," is not to be construed as simply casting the burden of proving the good faith of the transaction on the purchaser, but is to be construed as meaning that noncompliance by the purchaser with the provisions of the act shall make the sale voidable as to creditors without regard to the intent of the parties to it.

*Constitutional law—Class legislation—Federal constitution—Fourteenth amendment—Act of March 28, 1905, P. L. 62—Sale in bulk of stock of merchandise.*

The act of March 28, 1905, entitled "An Act relative to the sale in bulk of the whole, or a large part of a stock of merchandise and fixtures, or merchandise, or fixtures, not in the ordinary course of business; providing certain requirements therefor, imposing certain duties upon the seller, and making their violation a misdemeanor," is not arbitrary class legislation which denies to those affected by it the equal protection of the laws guaranteed by the fourteenth amendment of the federal Constitution.

Class legislation, discriminating against some and favoring others, is prohibited; but legislation which in carrying out a public purpose is limited in its application, if within the sphere of its operation it affects all persons similarly situated, is not within the amendment.

The Act of March 28, 1905, P. L. 62, deals with a particular class of sales, but the rule of conduct prescribed for the seller in each sale within the class is precisely the same as that prescribed for the seller in every other sale within the class, and the same is true of the purchaser.

It is not necessary that a statute regulating the sale of goods shall embrace all kinds of property, either personal or real, but it is sufficient if the selection of the articles and property is based on reasonable and just grounds of difference, and the prohibition comprehends all kinds of property within the relations and circumstances which constitute the distinction, extends equally to every citizen, and all classes of citizens, and denies to no one a privilege which another is permitted under the like circumstances to exercise.

The Act of March 28, 1905, P. L. 62, is not an unconstitutional and unwarranted infringement of the liberty, and of the right to acquire, possess, protect and dispose of property, guaranteed by the bill of rights both of federal and state constitutions.

The act relates to unusual and extraordinary transfers affording exceptional chances for fraud, and its enactment is a reasonable exercise of the police power within the discretion of the legislature.

*Constitutional law—Title of act—Statutes—Act of March 28, 1905, P. L. 62—Notice to purchasers.*

The act of March 28, 1905, entitled "An Act relative to the sale in bulk of the whole, or a large part of a stock of merchandise and fixtures, or merchandise, or fixtures, not in the ordinary course of business; providing certain requirements therefor; imposing certain duties upon the seller, and making their violation a misdemeanor," is not defective in title in failing to give sufficient notice of the duties imposed upon the purchasers to whom it applies.

Argued April 24, 1906. Appeal, No. 146, April T., 1906, by defendant, from order of C. P. No. 3, Allegheny Co., Feb. T., 1906, No. 102, discharging rule for interpleader in case of Elliott Wilson and William McConkey, trading as Elliott Wilson Cigar Company, v. J. W. Edwards, trading as the Allegheny Cigar Company, B. B. Caniff, claimant. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY and HEAD, JJ. Affirmed.

Rule for interpleader. Before KENNEDY, P. J.
The facts are stated in the opinion of the Superior Court.
The court discharged the rule for interpleader.

*Error assigned* was the order of the court.

*Charles A. Poth*, with him *Thomas H. Hasson*, for appellant. —Fraud must be established either by direct proof or facts sufficient to warrant a presumption of its existence: Jones v. Lewis, 148 Pa. 234.

Claimant contends that the construction urged by plaintiff is unconstitutional.

1. Because it violates art. 1, sec. 1 of the constitution of the state of Pennsylvania because it deprives the vendor and the vendee of the rights and privileges secured to them as citizens of said state, to wit: the right and liberty of "acquiring, possessing and protecting property."

2. Because it also violates sec. 1, art. XIV of the amendments to the constitution of the United States, by depriving the vendor and vendee, referred to in the said complaint, respectively, of their liberty, without due process of law, to wit: of the liberty of contracting for the sale and purchase of merchandise in bulk, of exercising the unrestricted and unham-

pered right of engaging in commerce, and of transacting lawful business.

3. Because it also violates sec. 1, art. XIV, of the said amendments to the constitution of the United States, by depriving the vendor and vendee, referred to in said complaint, respectively, of property, without due process of law, to wit: the right of the vendor to sell, dispose of and enjoy his property, is taken from him, or is seriously impaired and the right of the vendee to acquire property, and to use and enjoy the same, is likewise taken away and impaired. See Waters v. Wolf, 162 Pa. 153 ; Allgeyer v. Louisiana, 165 U. S. 578 (17 Sup. Ct. Repr. 427) ; Godcharles v. Wigeman, 113 Pa. 431 ; Block v. Schwartz, 27 Utah, 387 (76 Pac. Repr. 22) ; Miller v. Crawford, 70 Ohio, 207 (71 N. E. Repr. 631) ; Wright v. Hart, 182 N. Y. 330 (75 N. E. Repr. 404).

*Robert Woods Sutton*, with him *Watson & Freeman*, for appellees.—The true intent of the act is that creditors shall have notice of the sale, whether it is a perfectly fair one, or whether there is fraud, on the part of the vendor alone, or on the part of both the vendor and vendee, in order that they may protect their interests.

Surely the act would be emasculated were we to say that it meant that this notice need only be given by the purchaser where he was guilty of fraud ; and yet this is the logical conclusion of appellant's argument ; for, so long as he knows that he has not been guilty of fraud, he need not trouble to demand the list and send out the notices, for his title would be in no danger from a noncompliance.

The act is constitutional : Squire & Co. v. Tellier, 185 Mass. 18 (69 N. E. Repr. 312) ; Walp v. Mooar, 76 Conn. 515 (57 Atl. Repr. 277) ; McDaniels v. Connelly Shoe Co., 30 Wash. 549 (71 Pac. Repr. 37) ; Com. v. Jones, 4 Pa. Superior Ct. 362 ; Kennedy v. Ins. Co., 165 Pa. 179 ; Powell v. Com., 114 Pa. 265 ; Com. v. Vrooman, 164 Pa. 306 ; Neas v. Borches, 109 Tenn. 398 (71 S. W. Repr. 50) ; Hart v. Roney, 93 Md. 432 (49 Atl. Repr. 661) ; Fisher v. Herrmann, 118 Wis. 424 (95 N. W. Repr. 392).

OPINION BY RICE, P. J., February 25, 1907 :

By virtue of an execution issued upon a judgment against

J. W. Edwards, a stock of merchandise in the retail cigar stand, of which he was formerly the proprietor, was levied upon by the sheriff on January 15, 1906. B. B. Caniff having given notice that he claimed the goods, the court, upon the sheriff's application, granted a rule on the plaintiffs in the execution and the claimant to show cause why an issue should not be framed to determine the ownership, as provided in the sheriff's interpleader act of 1897. In response to the rule the claimant answered, that on November 25, 1905, he purchased from Edwards his entire stock of goods, good will and business; that he paid the agreed price and received a bill of sale for the goods and an assignment of the lease, "all of which was done in good faith;" and that he was still the owner of the goods. It appeared by the plaintiffs' answer, and is not disputed, that the debt of Edwards, for which the judgment was obtained, was incurred prior to this alleged sale, and it was admitted by the claimant on the argument of the rule, that he did not give notice to the plaintiffs at the time he bought the goods from Edwards, as required by the Act of March 28, 1905, P. L. 62. The court discharged the rule and directed the sheriff to proceed with the execution; whereupon the claimant took this appeal.

The first question to be considered is as to the construction of the act, and particularly the first section, which reads as follows: "That the sale in bulk of the whole, or a large part, of a stock of merchandise and fixtures, or merchandise, or fixtures, otherwise than in the ordinary course of trade and in the regular and usual prosecution of the seller's business, shall be deemed fraudulent, and voidable as against the creditors of the seller, unless the purchaser shall, in good faith, and for the purpose of giving the notice herein required, make inquiry of the seller, and receive from him a list in writing of the names and places of residence or business of each and all of his creditors, and, unless the purchaser shall, at least five days before the consummation of the sale, give personal notice of said proposed sale, to each of the creditors of the seller as appearing on said list, or use reasonable diligence to cause personal notice to be given to them, or shall deposit in the mail a registered letter of notice, postage prepaid, addressed to each of the seller's said creditors at his post-office address, according to the written

information furnished : Provided, however, that no proceedings at law or equity shall be brought against the purchaser to invalidate any such voidable sale, after the expiration of ninety days from the consummation thereof."

It is contended that the plaintiff has not instituted a proper proceeding to have the sale set aside as to creditors ; that if the legislature had in mind the protection of creditors, it was the protection of all the creditors equally, and not merely the protection of an alert and active creditor who secures judgment and issues execution. This position is not tenable. It is not incumbent on a creditor, as to whom such a sale is fraudulent and voidable, to obtain the co-operation of other creditors. He has the right to attack it in the method which was always an available and appropriate method for a creditor to pursue in order to invalidate, that is, to render of no legal force and effect, so far as the collection of his claim is concerned, a sale of chattels by a debtor, which as to such creditor is voidable upon the ground of fraud. To levy on the goods as the property of the debtor, and in response to the sheriff's rule to interplead to aver the facts which made such sale fraudulent and voidable as to creditors, is an appropriate proceeding " to invalidate any such voidable sale " within the meaning of the act of 1905.

Another point urged by the claimant with more apparent confidence is that a failure on the part of the purchaser to comply with the provisions of the act simply raises a prima facie presumption of fraud, thus relieving a creditor of the necessity of producing evidence to that effect, and at the same time casting the burden of establishing the good faith of the transaction on the purchaser. It is argued, on the other hand, that this construction would make it possible now, as it was before the passage of the act, for a dealer to carry into successful execution a dishonest scheme to cheat his creditors by converting his entire stock of merchandise into money by a sale in bulk, " because money is more easily shuffled out of sight," provided the other party to the transaction is not implicated in the intended fraud otherwise than as a bona fide purchaser for value. Counsel show quite clearly, and we think it must be conceded, that, owing to the facility which such a transaction affords for defrauding creditors, the suggested construction would deprive the statute of much of its effectiveness as a remedy for the mis-

chief the legislature had in view. Moreover, the words chosen by the legislature to express their will leave no room for doubt that they intended to do more than simply to change the law as to the burden of proof. The language is, "shall be deemed fraudulent and voidable as against the creditors of the seller," not simply "shall be presumed" to be fraudulent, etc. If the latter expression had been used, it might be argued with some plausibility that the legislature did not have in mind an irrebuttable presumption. See Hart v. Roney, 93 Md. 432 (49 Atl. Repr. 661). But the word "deemed" was evidently chosen advisedly and with reference to a meaning that is attached to it, not only by the lexicographers, but also by the courts in adjudicated cases involving the construction of statutes. For example, it has been held that when by statute certain acts are deemed to be crimes of a particular nature, they are such crimes, and not a semblance of it, nor a mere fanciful approximation to or designation of the offense : Commonwealth v. Pratt, 132 Mass. 246 ; 1 Bouv. L. D. (Rawles ed.) 526. One of the meanings of the word "deem" is, "to judge; adjudge; decide:" Standard Dict.; Russell v. Russell, L. R. 14 Ch. Div. 471, 478 ; Brozel v. Buffalo, 2 Silv. (N. Y.) 375 ; and the word "deemed" is often used in the sense of, "held, adjudged, declared:" 5 Am. & Eng. Ency. of Law (1st ed.), 458, and of, "judged, determined, considered or judged ;" 13 Cyclopedia of Law and Procedure, 757. In a note in the book last cited a case is referred to in which it was said: "And when it is enacted that the vendor of an article shall for any purpose 'be deemed the manufacturer thereof,' for such purpose, he is to be absolutely considered such manufacturer." So in the construction of the act of congress relative to naturalization it was said: "The word 'deemed' is the equivalent of 'considered' or 'judged'; and, therefore, whatever an act of congress requires to be 'deemed' or 'taken' as true of any person or thing, must, in law, be considered as having been duly adjudged or established concerning such person or thing, and have force and effect accordingly. When, therefore, congress declares that an alien woman shall, under certain circumstances, be 'deemed' an American citizen, the effect, when the contingency occurs, is equivalent to her being naturalized directly by an act of congress, or in the usual mode thereby prescribed:" Leonard v. Grant, 5 Fed. Repr. 11. "The

sense given to particular words by our great lexicographers is always entitled to weight. Yet where a word is used in an act of assembly regard must be had to the circumstances surrounding its use : " Penna. R. R. Co. v. Price, 96 Pa. 256 ; Commonwealth v. Hufnal, 4 Pa. Superior Ct. 301. Therefore we do not base our decision exclusively, either upon the meaning ascribed to the word " deemed " by the lexicographers, or upon the meaning ascribed to it by the courts in the construction of other statutes. Having regard, however, to " the old law, the mischief and the remedy," as well as to the natural and ordinary meaning of the word when used in such a connection as this, we entertain no doubt that it was intended by the legislature that noncompliance by the purchaser with the provisions of the act should render the sale voidable as to creditors. This conclusion makes it necessary to consider the objections that have been urged against the act upon constitutional grounds.

First, it is objected that the act does not apply to all persons alike, but only to merchants, and is arbitrary class legislation which denies to those affected by it the equal protection of the laws guaranteed by the fourteenth amendment of the federal constitution. Nowhere in the act does the word dealer, vender, or merchant appear, and it is reasonably certain that a sale by such person of goods or fixtures not employed in his business, as, for example, the furniture in his dwelling, was not intended to be governed by this statute. We mention this to show that it is not the business or the occupation of the seller which alone determines whether or not the purchaser must comply with its provisions. The act speaks of " a stock of merchandise and fixtures," and of a sale of them " otherwise than in the ordinary course of trade and in the regular and usual prosecution of the seller's business." When read together and with the context these clauses imply, we think, not simply that the goods were once merchandise, that is, commodities traded in by merchants, but that at the time of the sale they still bore the character of " a stock of merchandise," that is, goods and merchandise employed in trade, which in the ordinary course of trade, and in the regular and usual prosecution of the seller's business, would be sold or bartered otherwise than by a sale in bulk. The statute deals with a particular class of sales, but the rule of conduct prescribed for the seller in each sale within the class

is precisely the same as that prescribed for the seller in every other sale within the class, and the same is true of the purchaser. It is true the effect of the legislation is to require the parties to such sale to do that which parties to other sales of personalty are not required to do, and in that sense it is class legislation with respect to persons as well as to things. But the first section of the fourteenth amendment does not prohibit classification of the subjects of legislation and the application of different regulations to different classes, and no one at this day contends that it does. Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a. public purpose, is limited in its application, if within the sphere of its operation it affects all persons similarly situated, is not within the amendment: Barbier v. Connolly, 113 U. S. 27 (5 Sup. Ct. Repr. 357). It was declared, however, in the same case, that it was intended, amongst other things, " that no impediment should be interposed to the pursuits of anyone except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition." . Other forms in which the same general principle has been expressed are, " that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances: " Missouri v. Lewis, 101 U. S. 22; " that all persons subject to legislation limited as to the objects to which it is directed, or by the territory within which it is to operate, 'shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed: ' " Hayes v. Missouri, 120 U. S. 68 (7 Sup. Ct. Repr. 350); Connolly v. Union Sewer Pipe Co., 184 U. S. 540 (22 Sup. Ct. Repr. 431); that this clause of the fourteenth amendment " only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances: " Kentucky Railroad Tax Cases, 115 U. S. 321 (6 Sup. Ct. Repr. 57); that the rule " is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation : and equality of operation does not mean indiscriminate operation on persons merely as such,

but on persons according to their relation : " Magoun v. Illinois Trust and Savings Bank, 170 U. S. 283 (18 Sup. Ct. Repr. 594). In one of the latest cases in which a statement of the general principle is made, it is said : " It is not the purpose of the fourteenth amendment, as has been frequently held, to prevent the states from classifying the subjects of legislation, and making different regulations as to the property of different individuals differently situated. The provision of the federal constitution is satisfied if all persons similarly situated are treated alike in privileges conferred or liabilities imposed : " Field v. Barber Asphalt Paving Co., 194 U. S. 618 (24 Sup. Ct. Repr. 784). None of these statements of the general rule is irreconcilable with the doctrine of Gulf, Colorado & Santa Fe Railway Co. v. Ellis, 165 U. S. 150 (17 Sup. Ct. Repr. 255, that where it is apparent that the legislative classification is not based on any reasonable ground, or any differences which bear a just and proper relation to the subject with reference to which the classification is attempted, but is a mere arbitrary selection it will not relieve the state from the ban of the equality clause of the fourteenth amendment. Many other citations to the same effect might be given, but it is unnecessary. We have given enough to show, that while the question whether there is occasion for legislation regulating one class of sales which is not required or would not be applicable for the regulation of all sales is primarily a legislative question, yet it is within the jurisdiction of the courts, and their duty, to determine whether in the attempted classification other constitutional limitations of legislative power have been transgressed. As to the general principles which are to guide the courts in such determination there is no dispute, and in view of the numerous authoritative declarations of them no room for serious difference of opinion. We shall refer to some of these later. The difficulty, as was pointed out by Justice McKenna in Magoun v. Illinois Trust. etc., Co., 170 U. S. 283 (18 Sup. Ct. Repr. 594), and by Justice Harlan in Connolly v. Union Sewer Pipe Co., 184 U. S. 540 (22 Sup. Ct. Repr. 431, is in declaring in a single comprehensive rule " what is the test of likeness and unlikeness of circumstances and conditions," that is always to be applied whenever the question arises whether a statute having its source in the uncontroverted power to classify infringes

rights protected by this clause of the federal constitution. It is easy to show that certain differences—for example, the color, race, nativity, religious opinions, political affiliations, or the like, of the seller or purchaser—do not bear any just, reasonable or proper relation to the subject of legislation like that in question; but it is difficult to specify all the differences that do and all the differences that do not come up to this standard, and we shall not attempt it. It seems, however, that the mere occupation of the seller would not be ground for discriminating against him in legislation relating to sales of personalty in general. But no such discrimination is made in this act. The sales to which the act applies are in their very nature of an exceptional class, and, in addition to the presumption that the legislature arrived at its conclusion upon due consideration and investigation of all the facts and conditions that ought to be considered, substantial reasons could be given for a regulation like that in question of this class of sales which would be inappropriate to every sale of personalty. It has been held that it is not necessary that a statute regulating the sale of goods shall embrace all kinds of property, either personal or real, but it is sufficient if the selection of the articles and property is based on reasonable and just grounds of difference, and the prohibition comprehends all kinds of property within the relations and circumstances which constitute the distinction, extends equally to every citizen and all classes of citizens, and denies to no one a privilege which another is permitted under like circumstances to exercise: 8 Cyclopedia of Law & Procedure, 1069, citing Booth v. People, 186 Ill. 43 (57 N. E. Repr. 798). This principle commends itself and it is as pertinent in this case as it was in the case in which it was applied. Bearing in mind further, that the burden rests on him who alleges the unconstitutionalty of the law, not on him who invokes its application and enforcement, we are unwilling to hold that the regulation in question, which applies as we have seen to all sellers and purchasers similarly situated, and to every sale in bulk of an entire stock of merchandise otherwise than in the ordinary course of trade and in the usual prosecution of the seller's business, is based on mere arbitrary selection, and not on differences which bear a just and proper relation to the subject.

Secondly, it is objected that the act is an unwarranted infringement of the liberty, and of the right to acquire, possess, protect and dispose of property, guaranteed by the federal as well as the state constitution. At the outset of the discussion of this objection it seems appropriate to advert to certain well-settled general principles which govern the courts when called upon to exercise their unquestioned jurisdiction to adjudge as to the constitutionalty of a legislative enactment. This will be a sufficient answer to some of the criticisms that have been made of the law without further reference to these criticisms in detail. In a recent case in which the validity of the Massachusetts vaccination law was in question it was declared: "If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of the rights secured by the fundamental law, it is the duty of the court to so adjudge, and thereby give effect to the constitution:" Jacobson v. Mass. 197 U. S. 11 (25 Sup. Ct. Repr. 358), citing Mugler v. Kansas, 123 U. S. 623 (8 Sup. Ct. Repr. 273); Minnesota v. Barber, 136 U. S. 313 (10 Sup. Ct. Repr. 862); Atkin v. Kansas, 191 U. S. 207 (24 Supr. Ct. Rep. 124). It is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizens against merely arbitrary power. They have no right to avoid this duty by carrying the presumption of good faith and knowledge of existing conditions upon the part of the legislature to the extent of always holding that there must be some undisclosed and unknown reason for subjecting certain individuals or corporations to hostile and discriminating legislation: Gulf, Colorada & Santa Fê Ry. Co. v. Ellis, 165 U. S. 150 (17 Sup. Ct. Repr. 255); Collett v. Scott, 30 Pa. Superior Ct. 430. But it is equally true, that the argument that a certain kind of legislation is unwise and dangerous in its tendencies can be of little avail, unless the provisions of the fundamental law with which it conflicts can be pointed out. " No evils arising from such legislation could be more far-reaching than those that might come to our system of gov-

ernment if the judiciary, abandoning the sphere assigned to it
by the fundamental law, should enter the domain of legislation,
and, upon grounds merely of justice or reason or wisdom, an-
nul statutes that had received the sanction of the people: "
HARLAN, J., in Atkin v. Kansas.    In our own state authori-
tative declarations, scarcely less emphatic, as to the prov-
ince of the judicial department of the government have been
made.    Speaking of the Act of February 4, 1870, P. L. 14,
then under consideration, Justice WILLIAMS said : " First, we
must remember that the legal presumption is in favor of the
constitutionality of the act because it expresses the judgment
of the legislative branch of the government upon that question.
The legislature has considered the question and passed upon it
and this makes a prima facie case in favor of the law : " Com-
monwealth v. Vrooman, 164 Pa. 306.    " Nothing but a clear
violation of the constitution, a clear usurpation of powers pro-
hibited, will justify' the judicial department in pronouncing an
act of the legislative department unconstitutional and void : "
SHARSWOOD, J., in Penna. R. R. Co. v. Riblet, 66 Pa. 164.
" The right of the judiciary to declare a statute void and to
arrest its execution is one which, in the opinion of all courts,
is coupled with responsibility so grave that it is never to be
exercised except in very clear cases.    One department of the
government is bound to presume that another has acted rightly.
The party who wishes to pronounce a law unconstitutional
takes upon himself the burden of proving beyond all doubt that
it is so : " BLACK, J., in Erie & North East R. R. Co. v. Casey,
26 Pa. 287 ; quoted with approval by STERRETT, J., in Powell
v. Commonwealth, 114 Pa. 265.    The general doctrine was
elaborately restated by the present Chief Justice in Common-
wealth v. Moir, 199 Pa. 534, where he said : " This court is
not authorized to sit as a council of revision to set aside or re-
fuse assent to ill considered, unwise or dangerous legislation.
Our only duty and our only power is to scrutinize the act with
reference to its constitutionality, to discover what if any pro-
visions of the constitution it violates."    In another part of the
opinion, after quoting from Cooley on Constitutional Limita-
tions (6th ed.) p. 201, Commonwealth v. McCloskey, 2 Rawle,
369, and Scowden's Appeal, 96 Pa. 422, he said : " Nor are
the motives of the legislators, real or supposed, in passing the

act, open to judicial inquiry or consideration. The legislature is the law making department of the government, and its acts in that capacity are entitled to respect and obedience until clearly shown to be in violation of the only superior power, the constitution." The question for decision is to be. considered in the light of these principles.

Under the right guaranteed by our state constitution to acquire, possess and protect property, there is necessarily included the right to make reasonable contracts concerning it. It is also part of the liberty which is declared to be an inalienable right. " The methods by which this right to acquire property is asserted and exercised are, however, and have been since organized government began among men, subject to regulation by law. The power of government thus brought into service is known as the police power: " WILLIAMS, J., in Commonwealth v. Vrooman, 164 Pa. 306. In the same case Justice DEAN, who vigorously dissented from the judgment sustaining the constitutionality of the law then under consideration, nevertheless conceded that all the authorities agree that the legislature may, in the exercise of the police power, absolutely forbid contracts which are inimical to public interests, and may adopt suitable regulations of contracts for the protection of the public. As to the clause of the fourteenth amendment of the federal constitution, which forbids any state to deprive any person of liberty or property without due process of law, it is sufficient to say that the freedom of contract which is necessarily included in the rights here protected, is subject to certain limitations which the states may impose in the exercise of its police power and that in the exercise of that power a large discretion is necessarily invested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of those interests: Holden v. Hardy, 169 U. S. 366 (18 Sup. Ct. Repr. 383); Minnesota Iron Co. v. Kline, 199 U. S. 593 (26 Sup. Ct. Repr. 159). It is unnecessary to cite other authorities in support of the general doctrine that the police power, which is necessarily inherent in every form of government, and the exercise of which our state constitution declares " shall never be abridged," was not excluded from our state government in matters affecting personal liberty, and the acquisition, possession and protection of property by the provi-

sions of the federal or state constitutions.    But it will not be out of place to cite in this connection the commonly accepted statement of Chief Justice SHAW, as to the extent and limitations of this power: " We think it a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified his title may be, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.   All property . . . . is held subject to those general regulations which are necessary to the common good and general welfare.   Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient: " Commonwealth v. Alger, 61 Mass. 53.   " This power," it has been declared, " legitimately exercised can neither be limited by contract nor bartered away by legislation: " Holden v. Hardy, 169 U. S. 366 (18 Sup. Ct. Repr. 383); McKeesport v. McKeesport, etc., Pass. Railway Co., 2 Pa. Superior Ct. 242; Erie v. Erie Electric Motor Co., 24 Pa. Superior Ct. 77.   The most proper business may be regulated to prevent its becoming offensive to the public sense of decency, or for any other reason injurious or dangerous; and rules for the conduct of the most necessary and common occupations are prescribed when from their nature they afford peculiar opportunities for imposition and fraud :. Cooley on Const. Limitations (6th ed.), 743.   Notable examples of laws enacted for the prevention of fraud and deception are the act of 1870 making it a misdemeanor for any person to issue a policy of insurance against loss by fire or lightning without authority being expressly conferred so to do by a charter of incorporation issued according to law, which was held to be constitutional in Commonwealth v. Vrooman, 164 Pa. 306, and the act of 1885 prohibiting the manufacture and sale of oleomargarine, which was held to be constitutional in Powell v. Commonwealth, 114 Pa. 265; s. c., 127 U. S. 678 (8 Sup. Ct. Repr. 992, 1257). These acts absolutely prohibited an individual from engaging in

a certain business, and all persons, whether natural or artificial, from selling a certain article of food, both of which were previously lawful and not in themselves harmful. If such legislation is permissible in order to secure the public against fraud and injury, it is impossible to see upon what ground it can be safely declared that in the regulation of the class of sales under consideration the legislature transgressed constitutional limitations of its power. Another pertinent illustration is the act of 1872 requiring that notes given for patent rights shall have the words " given for patent right " prominently placed on the face thereof, and making it a misdemeanor to take, sell or transfer a note given for that consideration, not having these words written or printed thereon, which act was held to be free from constitutional objections in Haskell v. Jones, 86 Pa. 173, and Shires v. Commonwealth, 120 Pa. 368. The remarks of VANN, J., in Wright v. Hart, 182 N. Y. 330 (75 N. E. Repr. 404), although in a dissenting opinion, commend themselves, and may be appropriately quoted in this connection for the purpose of the illustrations they give of the extent that the legislatures have gone in the matter of regulation. " Many restraints upon freedom of contract, some of which reach back to our colonial history, have passed without challenge, or if challenged have uniformly been sustained as valid. The statute of frauds, the act to prevent fraudulent conveyances, insolvent laws, the recording act, the prohibition of usury, lien laws, regulations in relation to chattel mortgages, conditional sales and preferences by corporations and in general assignments, show in how many ways and in what varied forms the legislature may properly restrain freedom of action in commercial transactions in order to promote the general welfare. Originally all parol contracts for the sale of personal property were valid and it was unnecessary to make delivery or payment wholly or in part. The recording act was unknown, and transfers in writing, whether absolute or conditional, did not have to be filed. Now, however, many statutes require business to be transacted in a certain way, and that constructive notice should be given in order to protect creditors and innocent purchasers. Such interference with liberty and such limitations upon the use of property, although arbitrary and inconvenient, have always been regarded as valid in order to prevent fraud and promote justice. While commerce is

hampered to a limited extent in some ways, it is protected and promoted to a much greater extent in other ways.   The inconvenience of the restraint is less than the evil done away with." This act does not deprive the owner of the right to dispose of his stock of merchandise by public or private sale or in any manner that he chooses.   He is simply required, upon the application of the purchaser, to furnish the latter with a list in writing of the names and places of residence or business of his creditors, in order that the purchaser may comply with the requirement to notify them in the manner described.   If the purchaser does not make the inquiries referred to in the act, or if both parties agree to dispense with its requirements, the only penalty is that the sale is voidable as to creditors for the period of three months.   If the purchaser complies in good faith with the provisions of the act his title is secure, and he is at liberty not to comply with them if he is willing to forego the security which such compliance will give.   In a leading case Chief Justice BLACK said : " If a debtor, with the purpose to cheat his creditors, converts his land into money because money is more easily shuffled out of sight than land, he of course commits a gross fraud : " Covanhovan v. Hart, 21 Pa. 495.   If in the place of the word " land " we substitute the words " stock of merchandise otherwise than in the ordinary course of trade and in the regular and usual transaction of the seller's business," the remark would be equally true, and would fitly describe a kind of fraud that had become so common, and was so inadequately provided against under the old law, as to justify legislative action.   The manifest object of the legislation is to prevent, or at least to render more difficult and improbable, the successful perpetration of that kind of fraud, and the means chosen by the legislature have a real and substantial relation to that object.   They were clearly not enacted for the mere purpose of oppressing any class of persons, but were designed rather to promote, with as little individual inconvenience as possible, the general good.   Compliance therewith in good faith tends not only to the protection of creditors, but to the security of the purchaser in his title as well.

In many states of the union similar legislation, but in many instances much more stringent, has been adopted.   The conclusions of the several courts in those cases in which its con-

stitutionality has been passed upon are not in harmony, but the preponderance of decisions, at least as far as number is concerned, seems to be in harmony with the conclusion we have reached. It would unduly prolong this opinion to attempt a review of these several cases. While entertaining the highest respect for the decisions of the courts in which a different conclusion has been reached, we think that the view, thus expressed in the opinion of Chief Justice KNOWLTON of the supreme judicial court of Massachusetts, is the correct one: " The purpose of the legislature evidently was to provide for creditors protection against a class of sales which are frequently fraudulent, and which leave creditors with no means of collecting that which they ought to receive. The statute deals only with sales in bulk of a part or the whole of a stock of merchandise, which are not made in the ordinary course of trade, and in the regular and usual prosecution of the seller's business. It does not interfere with the transaction of ordinary business, but relates to unusual and extraordinary transfers. In substance, it declares that a sale of this kind shall not be made without first giving to creditors an opportunity to collect their debts, so far as the property to be sold might enable them to collect, or subsequently making satisfactory provision for the payment of these debts. A sale made in violation of the statute is void only as against creditors, and, if the vendor's debts are paid, the sale cannot be interfered with. A purchaser, to be safe, has only to see that the vendor's creditors are provided for. The vendee may sell freely, without regard to the statute, if he pays his debts. The legislature, when contemplating this legislation, had occasion to consider and balance against each other the general right of property owners to make contracts and dispose of their property, and the general right of creditors to be paid, and to have reasonable opportunities secured to them for the collection of their debts. . . . Although the requirements of the act are very strict, we cannot say that the determination of the legislature, as between the interests of owners of stocks of merchandise and their creditors was so far wrong as to render the statute unconstitutional. Within certain limitations, it is for the legislature to judge of the policy and expediency of a law, if, in other respects, they have power to enact

it: " Squire & Co. v. Tellier, 185 Mass. 18 (69 N. E. Repr. 312).

Another objection that has been made in one of the cases before us is, that the act is defective in that it fails to give sufficient notice of the duties imposed upon the purchasers to whom it applies. This objection can be best answered by quoting the title. It is, " An act relative to the sale in bulk of the whole, or a large part of a stock of merchandise and fixtures, or merchandise, or fixtures, not in the ordinary course of business; providing certain requirements therefor; imposing certain duties upon the seller, and making their violation a misdemeanor." This gives notice that the body of the bill contains certain provisions as to the requirements for such sale, and if the title had ended here, no one would contend that it would be defective because it did not specify all the requirements to be observed by the purchaser as well as by the seller. The addition of the next clause was evidently intended to give notice of the criminal liability of the seller in the event of his nonperformance of the duties devolving upon him. It would be hypercritical in the extreme to say that the addition of this clause would mislead anyone into the supposition that the act contains no requirements to be observed by the purchaser.

The judgment is affirmed.